UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

JAY M. HUMPHREY,                    )
                                    )
            Plaintiff,              )
                                    )
    vs.                             )        No. 4:07-CV-1898 (CEJ)
                                    )
MICHAEL J. ASTRUE,                  )
Commissioner of Social             )
Security,                          )
            Defendant.              )

## MEMORANDUM AND ORDER

This matter is before the Court for review of an adverse ruling by the

Social Security Administration.

## I.    Procedural History

On June 28, 2006, plaintiff Jay Humphrey filed an application for a

period of disability and disability insurance benefits under Title II of the Social

Security Act, 42 U.S.C. §§ 401 *et seq.*, with an alleged onset date of June 30,

2002.[1]    (Tr. 9).    After plaintiff's applications were denied on initial

consideration (Tr. 43-47), he requested a hearing from an Administrative Law

Judge (ALJ).    (Tr. 42).

The hearing was held on March 7, 2007.    Plaintiff was represented by

counsel.    (Tr. 939-61).    The ALJ issued a decision on June 20, 2007.    (Tr. 6-

20).    The Appeals Council denied plaintiff's request for review on September

---

[1]When plaintiff applied for disability benefits, he alleged an onset date
of June 10, 2004.    Plaintiff, however, "amended his onset date to June 30,
2002, the date [that] he was last insured for Disability Insurance Benefits
under Title II . . . ."    (Tr. 9).

18, 2007. (Tr. 2-4). Accordingly, the ALJ's decision stands as the Commissioner's final decision. See 42 U.S.C. § 405(g).

## II. Evidence before the ALJ

At the hearing, plaintiff's attorney, amended the disability onset date to June 30, 2002 to coincide with the last date of plaintiff's insurance. (Tr. 942).

At the time of the hearing, plaintiff was 58 years old.[2] (Tr. 942). Plaintiff was five feet and eight inches tall, weighed approximately one hundred sixty pounds, and was right-handed. Plaintiff testified that his weight had remained the same since June of 2002. (Tr. 943).

Plaintiff had lived alone since June 2002. Plaintiff served in the Navy from 1962 through 1972 and received an honorable discharge. (Tr. 943). Plaintiff testified that he received veterans' service-connected compensation at the fifty-percent compensation rate because of conditions with: (1) his right knee; (2) back strain; and (3) the dislocation of his left shoulder. Plaintiff received monthly compensation in the amount of $781. Plaintiff began receiving veterans' compensation when he was discharged from the Navy. Plaintiff testified that, initially, his compensation was calculated at a lower percentage rate, but that it increased over time. (Tr. 944).

Plaintiff completed four years of college and obtained a bachelor's degree in psychology in 1986. From 1997 through 2002, plaintiff worked on and off as a house painter and, in 2003, he worked in a factory for two weeks.

---

[2]Plaintiff was born on May 11, 1948. (Tr. 943).

Plaintiff also testified that he worked as a drug counselor for five years and as a blackjack dealer on the President Casino for two years. (Tr. 14, 945-46).

Plaintiff testified that the worsened condition of his right knee and liver had "kept [him] from working since June of 2002." (Tr. 946). Plaintiff testified that his right knee had been "crushed and [that he] had a staph infection in it and the bones touch . . . and rub together[,]" which required him to wear a brace and use crutches. (Tr. 946). Plaintiff started using a brace in 1973 and crutches in 2005. (Tr. 946-47).

Plaintiff testified that standing for fifteen or twenty minutes and bending down increased his knee pain. Plaintiff's knee condition had worsened over time, and his inability to stand existed in June 2002. (Tr. 947-48). Although he wore a knee brace, plaintiff experienced difficulty when bending. Plaintiff testified that walking made his knee "hurt a lot worse." (Tr. 948). Plaintiff's factory job required "quite a bit" of walking on concrete floors. (Tr. 948). For the past five or six years, plaintiff's entire right leg "[went] to sleep" when he sat for fifteen to twenty minutes. (Tr. 949). Plaintiff testified that he received medication to treat the knee pain. (Tr. 949). He took twenty-five milligrams of Amitriptyline for the knee pain with limited effectiveness, but the medication helped him sleep. In 1986, plaintiff received his last injections to treat his knee condition, which "made [him] feel better for a while." (Tr. 950).

Plaintiff also suffered from cirrhosis, which caused him constant pain on his right side. (Tr. 950-51). Plaintiff testified that the pain resulting from the cirrhosis and that it affected him "[p]robably four out of seven" days a week.

Plaintiff's pain on his right side forced him to lie down for thirty minutes to an hour. (Tr. 951).

Plaintiff testified that he sustained a brain concussion while serving in the navy. As a result, plaintiff sometimes experienced "trouble with directions." (Tr. 951). Plaintiff testified that this problem existed in 2002. To avoid getting lost, plaintiff usually asked someone to accompany him. Plaintiff also experienced headaches every two to three months which caused blurred vision and pain that "was bad enough to where it made [him] cry." (Tr. 952). Plaintiff did not recall when he started experiencing the headaches, but he claimed that he had trouble with his memory. Plaintiff also experienced some problems with dizziness and balance.

Plaintiff did not drive a car or own a driver's license. Plaintiff did not recall the last date on which he owned a driver's license. (Tr. 954). Plaintiff admitted that he had used illegal drugs since 2002, but claimed that he been sober since October 2004. In 1998 and 1999, and from June 2000 to December 2002, plaintiff was incarcerated in the Missouri Department of Corrections (DOC). (Tr. 11, 953, 959). Plaintiff testified that he did not have a job in prison because he "had a doctor's excuse because of [his] leg." (Tr. 953). Plaintiff believed that he suffered from depression. Plaintiff testified that he did not feel good about himself because of his inability to work. Plaintiff did not recall how long he had experienced depression. Apart from receiving treatment in the DOC, plaintiff sought medical treatment primarily at the United States Department of Veterans Affairs (VA). (Tr. 954).

When asked whether he experienced problems with lifting and carrying things, plaintiff testified that "it's hard to bend down to pick stuff up." (Tr. 955). Before he started using crutches, plaintiff could lift and carry fifteen pounds, but he "still had problems picking stuff up." (Tr. 955).

Since 2002, plaintiff's routine consisted of attending church on Saturdays and Sundays and sometimes spending time with his daughter on the weekends. Plaintiff experienced no problems with bathing himself, combing his hair, or brushing his teeth. (Tr. 955). Although "it just takes [him] a little longer," he can dress himself. (Tr. 956). Plaintiff made his bed, vacuumed and dusted his apartment, cooked, and washed dishes, but his daughter did his laundry. Plaintiff's daughter also took him to the store, so that he could grocery shop. Plaintiff had made no changes in his household activities since 2002, and he did not engage in any outdoor activities, such as fishing, hunting, or garden work. (Tr. 956). Plaintiff, however, enjoyed reading. (Tr. 959).

Plaintiff described his sleep as poor. Although he lay down at 9:00 p.m., plaintiff did not fall asleep until 2:00 or 3:00 in the morning and he usually awoke at about 6:30 or 7:00 a.m. Plaintiff testified that he had experienced this sleep pattern since 2002. (Tr. 957).

Plaintiff testified that, in 2004, the VA increased his disability payments from thirty to fifty percent. Plaintiff also testified that his part-time, painting job involved outside, house painting. Plaintiff worked twenty to thirty hours per week, earning $9.00 per hour. (Tr. 957). Plaintiff's employer allowed him

to sit down after standing for thirty minutes.  Since 2004, plaintiff had not engaged in "any painting or odd jobs[.]"  (Tr. 958).  For a period of time, plaintiff worked a couple a days per week at the Campus Inn, cleaning rooms.  Although the cleaning job required him to stand up, plaintiff sat down when he became tired.  (Tr. 958).

When he worked as a drug and alcohol counselor, plaintiff worked eight-hour days.  Plaintiff testified that he sat for "maybe two hours" of an eight-hour workday and that he spent the rest of the time walking and standing, presenting lectures and talking with different people.  (Tr. 958-59).

Before the conclusion of the hearing, the ALJ stated that he would "hold the record open for thirty days pending receipt of the medical records and [the records] from the department of corrections."  (Tr. 960).

### III.  Medical Evidence

On July 31, 1997, plaintiff underwent a physical examination at the DOC. Plaintiff's medical records indicate that he (1) tested positive for tuberculosis in 1990 and for hepatitis in 1994; (2) experienced joint pain and had old fractures on the right femur left shoulder, left toe, and left ankle, and (3) suffered a heart attack in 1985.  (Tr. 118).

A chest x-ray dated August 4, 1997, indicated that plaintiff had a "flattened left hemidiaphragm with blunting of the left costophrenic angle suspicious for a pleural reaction in otherwise negative chest."  (Tr. 121).  The DOC medical records dated August 21, 1997, indicate that plaintiff was medically cleared for duty as a food service worker.  (Tr. 220-22).

On September 8, 1997, plaintiff complained of liver swelling and reported that he had hepatitis C. (Tr. 124). On September 16, 1997, the DOC physician noted that plaintiff had contracted hepatitis C, that he was scheduled to have a liver biopsy at the VA hospital to determine if he needed interferon therapy, and that he was being considered for interferon therapy. (Tr. 125).

On October 10, 1997, a DOC nurse noted that plaintiff complained of pain on his right side, had a history of hepatitis C, which was diagnosed in 1994, and had right, upper quadrant tenderness since he had arrived at the DOC. (Tr. 126). The records indicate that, later that day, a DOC physician examined plaintiff. The doctor noted that plaintiff's liver enzymes were elevated as a result of hepatitis C. (Tr. 127).

On January 30, 1998, plaintiff underwent a physical examination at the DOC. The medical records indicate that plaintiff had a history of tuberculosis and Hepatitis, along with a surgical history. In addition, the DOC medical records reveal that plaintiff experienced problems with his left ankle, right femur, right patella, and left shoulder, and that he suffered from a heart attack in 1985. (Tr. 116).

Ahsan Syed, M.D., completed a psychiatric evaluation on March 10, 1998. (Tr. 315). Dr. Syed noted that plaintiff was "being seen on follow up from 2/10/98 . . . ." (Tr. 315). Dr. Syed's diagnostic impression was that plaintiff's polysubstance dependence was in remission while incarcerated, but that plaintiff suffered from dysthymic disorder and a personality disorder, not otherwise specified. (Tr. 315).

On April 6, 1998, plaintiff underwent a psychological evaluation at the DOC. The psychologist noted that plaintiff had been prescribed Paxil and Vistaril, was not experiencing suicidal ideations, and appeared calm and coping adequately . (Tr. 311). Plaintiff claimed that he had been sober for one year. (Tr. 311).

On April 7, 1998, the DOC doctor assessed plaintiff's duty restrictions. The doctor noted that plaintiff had myocardial infarction in 1985; however, he experienced no recurrent symptoms or recent chest pain. In addition, the doctor noted that plaintiff had a right knee deformity due to a crush wound, which "acted up occasionally." (Tr. 136). The DOC medical records dated April 8, 1998, reveal that, "Per orders of Dr. Lathrop, [plaintiff was] to be placed on limited duty with no prolonged standing or walking and [was] to have a 10 minute break with every hour or work." (Tr. 220, 335). The "Lay-in/Medical/Duty Restrictions" form indicates that plaintiff's restrictions included no prolonged standing assignments for more than a half an hour, no snow shoveling, and no strenuous activity. (Tr. 340). On April 9, 1998, a DOC nurse noted that plaintiff had a scar on his left knee and that he walked with a limp. (Tr. 136). In the DOC medical records dated April 23, 1998, the nurse reported that plaintiff was on limited duty, but that he wanted to attend school. On April 27, 1998, the doctor modified plaintiff's duty restrictions to enable him to attend the electronics school. (Tr. 137, 140).

During his doctor's appointment on February 2, 1999, plaintiff complained of some right, upper quadrant pain. (Tr. 145). The doctor noted

that plaintiff was scheduled to have his blood drawn on January 19, 1999; however, the blood was not drawn because plaintiff complained of "weakness and being sick to his stomach." (Tr. 145).

On September 1, 1999, plaintiff underwent a liver biopsy at the University of Missouri Hospital and Clinics. The surgical pathology report indicated that plaintiff suffered from "chronic Hepatitis C with mild activity and mild to moderate fibrosis." (Tr. 330). The VA medical records dated January 21, 2000 indicated that plaintiff was to start interferon therapy for hepatitis C in May 2000 for a duration of one year, and that his depression had improved. (Tr. 298). The VA medical records dated March 15, 2000, indicated that plaintiff was scheduled to begin interferon for chronic hepatitis C, experienced tension headaches, and was given a prescription for Trazodone to treat his insomnia. (Tr. 300). The VA medical records dated April 13, 2000, included a problem list for plaintiff, which included drug dependence, tobacco use, hepatitis C, stomach dysfunction, shoulder joint pain, alcohol dependence, insomnia, and headaches. (Tr. 286). On June 9, 2000, a urine test registered negative for amphetamines, barbiturates, benzodiazepines, COCM,[3] opiates, PCP, and cannabinoids. (Tr. 288).

The DOC medical records dated June 21, 2000, indicate that plaintiff had a history of hepatitis C since 1994 and a surgical history since 1991. The records also reveal that plaintiff suffered from occasional headaches, epistaxis,

---

[3] The acronym COCM refers to cocaine. See http://www.beckmancoulter.com/literature/ClinDiag/9282%20dat%206%20COCM%201002.pdf (last visited Feb. 4, 2009).

sinusitis, joint pain in the right leg, femur and knee, and experienced a heart attack in 1981. (Tr. 112, 114).

The DOC medical records dated June 27, 2000, report that plaintiff was admitted to the Cardiac and Hepatitis Clinic. (Tr. 148). On July 12, 2000, the DOC physician noted that plaintiff did not undergo an angioplasty or coronary artery bypass and determined that plaintiff suffered from chronic Hepatitis C. (Tr. 152).

On August 5, 2000, plaintiff complained of chest and musculoskeletal pain. (Tr. 155). A chest x-ray taken on August 7, 2000, revealed that:

> There [was] obliteration of the left costrophrenic angle by pleural fibrosis. This finding was also present in 1997. It represent[ed] a scar from [an] old infection. There [was] no evidence to suggest an active inflammatory process. There [were] chronic changes throughout with emphysema. The heart and aorta [were] within normal limits as to size.

(Tr. 156).

On September 21, 2000, the DOC nurse noted that plaintiff complained of occasional chest pains, had used nitroglycerin in the past, but had not used it recently, exercised by walking and weight lifting, and intended to return to farming upon release from prison. (Tr. 162). On October 5, 2000, plaintiff reported "pain to the left shoulder in association with movement and prolonged resting on arm/shoulder at night." (Tr. 165). On October 10, 2000, plaintiff reported that he experienced shoulder pain off and on since a four wheeler accident in May 1999. The DOC physician noted that a 1962 multiple, motor vehicle accident caused plaintiff's neck injury and that there was positive

crepitation in his left shoulder. (Tr. 166). A shoulder x-ray, taken on October 13, 2000, revealed that plaintiff had arthritis. (Tr. 167).

On April 11, 2001, plaintiff complained of lethargy/fatigue that had existed for past two years and requested that the doctor change his duty status. (Tr. 175-76). The next day a VA doctor noted that plaintiff had hepatitis C, but that he was not qualified for interferon and/or ribavirin on the following day. (Tr. 177).

During a doctor's appointment on April 19, 2001, plaintiff indicated that working in the cafeteria hurt his knees and made him tired. Plaintiff requested that the doctor place a restriction on how long he could stand while working. (Tr. 180). The DOC medical records dated May 19, 2001, indicate that plaintiff had experienced chronic achy-type pain in his right, upper quadrant for years and that he had recently started having sharp pain in this area, which was not related to food intake or movement. (Tr. 181). On May 30, 2001, the DOC physician noted that, at times, plaintiff experienced severe right, upper quadrant pain and suffered from a history of Hepatitis B and C, but he ruled out kidney and pancreas problems. The doctor encouraged plaintiff to use the emergency button if his pain became intense and to visit the infirmary for pain management. (Tr. 182).

The DOC medical records dated July 16, 2001, reveal that plaintiff complained of feeling tired and weak and could not exercise because of his right-leg injury. (Tr. 192). On December 4, 2001, the nurse noted that, "Per orders of Dr. Lathrop, [plaintiff] to be placed on limited duty with no prolonged

standing or walking and [was] to have a 10 minute break with every hour of work." (Tr. 199).

The VA medical records dated April 22, 2002, indicate that plaintiff was not sleeping well, worked long hours, and had been throwing up in the mornings. (Tr. 915). At this time, plaintiff reported a pain level of three. (Tr. 915).

On March 20, 2002, plaintiff exhibited flu-like symptoms, including headaches, fatigue, fever, chills, sweats, myalgia, along with abdominal pain in the right, upper quadrant, nausea in the morning, vomiting, as well as neuro-psychiatric symptoms, including addictive behavior, insomnia, irritability, skin itching, and chest pain. (Tr. 920). The next day Pamela Downing, M.D., noted that plaintiff experienced chronic active hepatitis C, abdominal pain, and prostatitis. (Tr. 927).

On June 20, 2002, therapist Linda Matteson, M.Ed., diagnosed plaintiff with alcohol and drug dependence and a depression disorder. (Tr. 910).

In the medical record dated August 1, 2002, Suzanne Opperman, RN, MSN, noted that plaintiff suffered from hepatitis C, and that he wanted to start treatment, but continued to drink alcohol. (Tr. 906). In addition, plaintiff exhibited flu-like symptoms, including headaches, fatigue, fevers, chills, sweats, myalgia in the right, upper quadrant, along with abdominal pain, nausea in the morning, and sometimes vomiting. Ms. Opperman also noted that plaintiff exhibited neuro-psychiatric symptoms, such as addiction to marijuana and alcohol, depression, insomnia, irritability, and itching as well as

-12-

chest pain.   (Tr. 904-5).  The VA medical records dated October 25, 2002 and November 12, 2002 indicate that plaintiff reported a pain level of two.  (Tr. 894-96).

On January 10, 2003, Dr. Downing noted that plaintiff suffered from chronic active Hepatitis C, a history of insomnia, headaches, and alcohol and drug abuse, degenerative joint disease, and depression.  (Tr. 887-89).  The record indicates that, from August 11, 2003 to November 7, 2004, urine tests conducted on plaintiff registered negative for amphetamines, barbiturates, benzodiazepines, COCM, opiates, PCP, and cannabinoids.  (Tr. 476).

The VA medical records dated March 16, 2004, indicate that plaintiff complained of knee pain and in the jaw and clavicle. Plaintiff also reported that he had lost his knee brace in a fire and needed a new one.  (Tr. 535, 871). Paul S. Jones, D.O., noted:

> Previous bilateral knee examination is not available for comparison.  Impression with previous bilateral knee was 1) postoperative/post-traumatic changes right knee with multiple metallic foreign bodies present.  2) bony fragment anterior to the distal femur which could represent residual patellar component. 3) degenerative changes in the right knee.
>
> There are old post-traumatic and also post-surgical changes at the knee.  There is surgical absence of the patella.  Small ovoid corticated density is seen in the soft tissue anterior to the distal femur.  This may be a small amount of residual patella or could represent calcification and soft tissue secondary to the level of the knee.  There are arthritic changes at the knee with medial and lateral joint space narrowing.  Interchondylar spines are prominent.

(Tr. 459, 537).  Dr. Jones also ordered plaintiff "a thigh and calf lacer KO right to help off-load the knee joint" and noted that plaintiff "may need to limit last 5 degrees of knee extension."  (Tr. 537).

In the VA medical records dated June 14, 2004, Donald Denby, M.D., a gastroenterologist, noted that plaintiff was smoking marijuana and drinking alcohol.  (Tr. 863-64).

On October 19, 2004, plaintiff was admitted to the VA Medical Center for alcohol rehabilitation, and secondarily for tachycardia and chest pain.  (Tr. 496).  On November 29, 2004, plaintiff underwent physical therapy at the VA Medical Center, and the provisional diagnosis was "[p]ain in joint involving [the] shoulder region."  (Tr. 521).  An x-ray indicated "mild arthritic changes . . . in [plaintiff's] right shoulder and ac joint."  (Tr. 444).  On January 5, 2005, Denise Salisbury, a registered nurse practitioner, noted that plaintiff had "shoulder pain with DJD[4] and probably bursitis"  and administered a steroid injection to his right shoulder.  (Tr. 691).

In the medical record dated March 22, 2005, Ms. Matteson noted that plaintiff had been sober since October 2004, diagnosed him with major depression, alcohol and cannabis abuse, and reported that he had an Axis V GAF Score of 50.[5]  (Tr. 684-85).  The next day, Ms. Matteson recommended

_____

[4]DJD is the acronym for degenerative joint disease.  (Doc. #18, at 11, par. 33).

[5]GAF is the acronym for Global Assessment of Functioning.  Am. Psychiatric Ass'n,  Diagnostic and Statistical Manual of Mental Disorders, 32 (4th ed. text rev. 2000) [hereinafter DSM-IV-TR].  A GAF score of 41 to 50 applies when there are  "serious symptoms (e.g., suicidal ideation, severe

-14-

that he undergo a neuropsychological evaluation for cognitive deficits because he complained of memory problems after getting lost in the grocery store.  (Tr. 517).  Plaintiff reported a pain level of six on March 23, 2005.  (Tr. 685).

On April 1, 2005, Jeffrey R. Thiele, M.D., diagnosed plaintiff with possible right hemisphere dysfunction and a mood disorder, along with an early remission of alcohol dependency and substance abuse and an Axis V GAF score of 55.[6]  Dr. Thiele ordered a "CT of [plaintiff's] head with and without contrast . . . for 4-4-05."  (Tr. 680).   CT scan revealed "a displaced right zygomatic fracture [but] no adjacent soft tissue swelling . . . adjacent to the fracture suggesting that it [was] old."  (Tr. 433)(capital letters in original).

On April 9, 2005, John F. Higdon, Ph.D., a staff psychologist at the VA Medical Center, conducted psychological follow-up of plaintiff and noted that:

> On the Beck Depression Inventory-II[,][7] he scored 26, or "Moderate Clinical Depression" (19-29). [Plaintiff] marked, "I have thoughts of killing myself but [he] would not carry them out."

---

obsessional rituals, frequently shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." Id. at 34.

[6]A GAF score of 51 to 60 applies when there are "moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)."  DSM-IV-TR at 34.

[7]"The Beck Depression Inventory . . . is a 21-question multiple-choice self-report inventory that is one of the most widely used instruments for measuring the severity of depression."  See http://en.wikipedia.org/wiki/Beck_Depression_Inventory (last visited Feb. 9, 2009).

On the Trial Making Part A[,] he [was] right at the 25th [percentile] range, so his processing speed [was] a bit reduced; for Part B he [was] at the 25th to 50th [percentile] range, so his cognitive flexibility [was] only slightly reduced. Part B [was] considered the more significant part.

[Plaintiff's] RBANS [was] quite inconsistent. His Immediate Memory [was] extremely low, Visuospatial/Constructional [was] average, Attention is borderline, and Delayed Memory [was] average.

Basically, the RBANS [was] supporting [plaintiff's] reported difficulty with memory, especially in its subset of Immediate Memory (his lowest subtest). The other tests [were] not, and his moderate depression certainly [did] not explain it. It [was] certainly worth further exploration neurologically. This [was] especially the case in light of his age and educational level.

(Tr. 672).

Plaintiff received "[f]orearm crutches with right leg weight bearing as tolerated" on May 4, 2005. (Tr. 516). The physical therapist noted that plaintiff "demonstrated safe and independent use of [the] equipment . . . ." (Tr. 516).

On May 18, 2005, Dr. Thiele diagnosed plaintiff with a cognitive disorder and mood disorder secondary to substance abuse and/or general medical condition, noted that he was in early remission of alcohol dependency and polysubstance abuse, and reported that he had a GAF score of 51[8]. (Tr. 666). Ms. Matteson reported that plaintiff's Axis V GAF score was 58 on August 11, 2005. (Tr. 659-60). The resident physician, Adriana E. Rascanu, noted that plaintiff complained of increased right knee and hip pain and weakness in his right knee when he wore his brace. Dr. Rascanu diagnosed plaintiff with degenerative joint disease and status post patellectomy of the right knee with

---

[8]See supra text accompanying note 6.

an onset of 1971.  (Tr. 661).  A surgical pathology report dated October 12, 2005, indicated that plaintiff suffered from chronic Hepatitis C with mild-activity cirrhosis.  The report also indicated that plaintiff had a history of "[a]bnormal liver functions."  (Tr. 390).

On March 13, 2006, plaintiff was admitted to the VA Medical Center "for severe abdominal pain, nausea, vomiting, diarrhea, and decreased oral intake." (Tr. 494).  Plaintiff complained of severe dizziness, muscle aches in his legs and arms, and joint pain in his knees and shoulders.  A CT scan of plaintiff's abdomen and pelvis on March 14, 2006 showed "[s]evere dysmorphic changes affecting the right proximal femur and [the] right hip . . . likely from old trauma." (Tr. 424-25).  Plaintiff was discharged on March 22, 2006.  (Tr. 494).

The VA medical records dated April 24, 2006 indicate that plaintiff experienced left-sided pain; however, plaintiff's March 2006 CT scan did not reveal "any suspicious lesions."  (Tr. 570).  As such, Ms. Opperman diagnosed plaintiff with advanced liver disease. (Tr. 570).

A CT scan of plaintiff's abdomen and pelvis on June 6, 2006 showed "[b]ilateral lung bases [were] visualized and changes consistent [with] emphysema and dependent atelectasis . . . ."  (Tr. 418).  On November 6, 2006, plaintiff underwent a myocardial perfusion study with wall motion, which indicated that he had normal perfusion and that coronary stenosis was very unlikely  (Tr. 452-53).

On December 6, 2006, plaintiff called the VA hepatology clinic and complained of coughing up black-colored phlegm and increased pain in the

area of his liver. (Tr. 405). Later that day, plaintiff went to the VA Medical Center's emergency room and reported a four-day history of hemoptysis. Plaintiff was diagnosed with community-acquired pneumonia. (Tr. 403.) The VA medical records also indicate plaintiff's significant smoking history, amended onset of hemoptysis, and night sweats. (Tr. 388). A CT of plaintiff's chest revealed (1) stable diffuse emphysematous changes and (2) no acute cardiopulmonary process. (Tr. 389).

The medical record dated February 14, 2007 contained a problem list for plaintiff, which included unspecified drug abuse, tobacco use disorder, hepatitis C, stomach function disorder, joint pain in the shoulder, alcohol dependence, insomnia, headaches, unspecified drug dependence, abdominal pain of unspecified site, prostatitis, tobacco dependence, depression, GERD,[9] cognitive disorder, and cirrhosis. (Tr. 383). Plaintiff was diagnosed with advanced liver disease. (Tr. 385).

Ayman Alzubi, M.D., completed a Cirrhosis/Liver Disease Medical Assessment form on March 7, 2007. (Tr. 378-82). Dr. Alubi diagnosed plaintiff with cirrhosis, chronic Hepatitis C, depression, GERD, and emphysema. Plaintiff's symptoms included weakness, jaundice, sleep disturbance, spider nevi, ecchymoticlesions, chronic fatigue, a history of varices and hepatocellura insult, peripheral edema, persistent/recurrent abdominal pain, cramping and tenderness, and Hepatitis C. (Tr. 378). Plaintiff claimed that he had last used

---

[9]GERD is the acronym for gastroesophageal reflux disease. See http://digestive.niddk.nih.gov/ddiseases/pubs/gerd/ (last visited Feb. 9, 2009).

alcohol or drugs in October 2004. (Tr. 379). Dr. Alzubi noted that plaintiff could only walk half a city block before resting or experiencing severe pain, sit for thirty minutes, and stand for ten minutes. (Tr. 380). During an eight-hour workday, plaintiff could only sit and stand/walk for less than two hours. Dr. Alzubi determined that plaintiff would need more than ten unscheduled thirty-minute breaks during an average eight-hour workday because of his pain/paresthesia, weakness, and chronic fatigue. (Tr. 380). Plaintiff could occasionally lift and carry less than ten pounds but rarely ten pounds. (Tr. 380-81). Dr. Alzubi estimated that plaintiff was absent more than four days a month as a result of his impairments and determined that plaintiff met the requirements for Listing 5.05 (F)(3). (Tr. 381).

## IV. The ALJ's Decision

Administrative Law Judge James E. Seiler presided at plaintiff's administrative hearing, and made the following findings:

1. The claimant meets the insured status requirements of the Social Security Act through June 30, 2002.

2. The claimant has not engaged in substantial gainful activity since June 10, 2004, the alleged onset date (20 C.F.R. §§ 404.1520(b) and 404.1571 *et seq.*).

3. The claimant had the following severe impairments: an alcohol addiction disorder, hepatitis C, cirrhosis of the liver, degenerative joint disease of the right knee, and a substance abuse disorder as of June 30, 2002 (20 C.F.R. § 4040.1520(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20   C.F.R. § 404.1520(d)).

5.      After careful consideration of the entire record, the undersigned finds that, based on all of the impairments, including the substance use disorder(s), the claimant has the residual functional capacity to stand and walk about four hours in an eight-hour workday, sit six hours in an eight-hour workday, and lift and carry twenty pounds occasionally and ten pounds frequently. He could not push or pull using his right leg. Nonexertionally the claimant could not respond appropriately to supervision, co-workers, and usual work situations; remember and carryout [sic] even simple instructions, or make adjustments to routine work changes.

6.      The claimant is unable to perform past relevant work (20 C.F.R. § 404.1565).

7.      The claimant was born on May 11, 1984 and was fifty-four years old, which is defined as an individual closely approaching advanced age, on the amended alleged disability onset date (20 C.F.R. § 404.1563).

8.      The claimant has a bachelor['s] degree in psychology and is able to communicate in English (20 C.F.R. § 404.15.64).

9.      The claimant's acquired job skills do not transfer to other occupations within the residual functional capacity defined above (20 C.F.R. § 404.1568).

10.      Considering the claimant's age, education, work experience, and residual capacity based on all of the impairments, including the substance use disorder(s), there are no jobs that exists in significant numbers in the national economy that the claimant can perform (20 C.F.R. §§ 404.1560(c) and 404.1566).

11.      If the claimant stopped the substance use, the remaining limitations would cause more than a minimal impact on the claimant's ability to perform basic work activities; therefore, the claimant would continue to have a severe impairment or combination of impairments.

12.      If the claimant stopped the substance use, the claimant would not have an impairment or combination of impairments that meets or medically equals any of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. § 404.1520(d)).

13.   If the claimant stopped the substance use, the claimant would have the residual functional capacity to stand and walk four hours in an eight-hour workday and sit six hours in an eight-hour workday subject to short breaks [for] every hour of standing.  He could lift and carry ten pounds frequently and twenty pounds occasional.  He could not push or pull with his right leg.

14.   If the claimant stopped the substance use, the claimant would be able to perform past relevant work as [a] drug and alcohol abuse counselor.  This work does not require the performance of work-related activities precluded by the residual functional capacity the claimant would have if he stopped the substance use (20 C.F.R. § 404.1565).

15.   Because the claimant would not be disabled if he stopped the substance use (20 C.F.R. § 404.1520(f)), the claimant's substance use disorder(s) is a contributing factor material to the determination of disability (20 C.F.R. § 404.1535).  Thus, the claimant has not been disabled within the meaning of the Social Security Act at any time from the alleged onset date through the date of this decision.

(Tr. 11-20).

## V.   Discussion

To be eligible for disability insurance benefits, plaintiff must prove that he is disabled.  Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001).  The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§ 423(d)(1)(A), 1382 (a)(3)(A) (2000).  An individual will be declared disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot,

considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner employs a five-step evaluation process, "under which the ALJ must make specific findings." Nimick v. Sec'y of Health and Human Services. 887 F.2d 864 (8th Cir. 1989). The ALJ first determines whether the claimant is engaged in substantial gainful activity. If the claimant is so engaged, he is not disabled. Second, the ALJ determines whether the claimant has a "severe impairment," meaning one which significantly limits his ability to do basic work activities. If the claimant's impairment is not severe, he is not disabled. Third, the ALJ determines whether the claimant's impairment meets or is equal to one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. If the claimant's impairment is, or equals, one of the listed impairments, he is disabled under the Act. Fourth, the ALJ determines whether the claimant can perform his past relevant work. If the claimant can, he is not disabled. Fifth, if the claimant cannot perform his past relevant work, the ALJ determines whether he is capable of performing any other work in the national economy. If the claimant is not, he is disabled. See 20 C.F.R. §§ 404.1520, 416.920 (2002); Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987).

A.   Standard of Review

The Court must affirm the Commissioner's decision, if the decision "is supported by substantial evidence on the record as a whole." Gladden v.

<u>Callahan</u>, 139 F.3d 1219, 1222 (8th Cir. 1998), <u>quoting</u> <u>Smith v. Schweiker</u>, 728 F.2d 1158, 1161 (8th Cir. 1984). "Substantial evidence is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion." <u>Estes v. Barnhart</u>, 275 F.3d 722, 724 (8th Cir. 2002), <u>quoting</u> <u>Johnson v. Apfel</u>, 240 F.3d 1145, 1147 (8th Cir. 2001). To determine whether the Commissioner's decision is supported by substantial evidence, the Court "must take into account whatever in the record detracts from its weight." <u>Gladden</u>, 139 F.3d at 1222, <u>quoting</u> <u>Smith v. Schweiker</u>, 728 F.2d at 1162. The Court may not reverse merely because the evidence could support a contrary outcome. <u>Estes</u>, 275 F.3d at 724. In determining whether the Commissioner's decision is supported by substantial evidence, the Court reviews the entire administrative record, considering:

1.      The ALJ's credibility findings;

2.      the plaintiff's vocational factors;

3.      the medical evidence;

4.      the plaintiff's subjective complaints relating to both exertional and nonexertional impairments;

5.      third-party corroboration of the plaintiff's impairments; and

6.      when required, vocational expert testimony based on proper hypothetical questions, setting forth the claimant's impairment.

See <u>Stewart v. Sec'y of Health & Human Services.</u>, 957 F.2d 581, 585-86 (8th Cir. 1992).

The Court must consider any evidence that detracts from the Commissioner's decision. <u>Warburton v. Apfel</u>, 188 F.3d 1047, 1050 (8th Cir.

1999).  Where the Commissioner's findings represent one of two inconsistent conclusions that may reasonably be drawn from the evidence, however, those findings are supported by substantial evidence.  Pearsall, 274 F.3d at 1217, citing Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000).

### B.    Plaintiff's Allegations of Error

Plaintiff contends that the ALJ failed to properly consider his Residual Functional Capacity (RFC) and his past relevant work as a drug and alcohol abuse counselor.

The ALJ determined that plaintiff suffered from the following severe impairments: an alcohol addiction disorder, Hepatitis C, cirrhosis of the liver, degenerative joint disease of the right knee, and a substance abuse disorder as of June 30, 2002.  (Tr. 12).  The ALJ concluded, however, that plaintiff's severe impairments did not meet or equal Listing 5.05, 20 C.F.R. Pt. 404, App. 1 to Subpt. P (entitled "Chronic liver disease"), nor Listing 12.09, 20 C.F.R. Pt. 404, App. 1 to Subpt. P (entitled "Substance Abuse Disorders").  In order to meet Listing 5.05, a claimant must satisfy one of the following conditions:

> A. Hemorrhaging from esophageal, gastric, or ectopic varices or from portal hypertensive gastropathy, demonstrated by endoscopy, x-ray, or other appropriate medically acceptable imaging, resulting in hemodynamic instability as defined in 5.00D5, and requiring hospitalization for transfusion of at least 2 units of blood. Consider under a disability for 1 year following the last documented transfusion; thereafter, evaluate the residual impairment(s).  OR
>
> B. Ascites or hydrothorax not attributable to other causes, despite continuing treatment as prescribed, present on at least two evaluations at least 60 days apart within a consecutive 6-month period. Each evaluation must be documented by:

1. Paracentesis or thoracentesis; or

2. Appropriate medically acceptable imaging or physical examination and one of the following:

    a. Serum albumin of 3.0 g/dL or less; or

    b. International Normalized Ratio (INR) of at least 1.5.

OR

C. Spontaneous bacterial peritonitis with peritoneal fluid containing an absolute neutrophil count of at least 250 cells/mm$^3$. OR

D. Hepatorenal syndrome as described in 5.00D8, with one of the following:

1. Serum creatinine elevation of at least 2 mg/dL; or

2. Oliguria with 24-hour urine output less than 500 mL; or

3. Sodium retention with urine sodium less than 10 mEq per liter.

OR

E. Hepatopulmonary syndrome as described in 5.00D9, with:

1. Arterial oxygenation ($P_aO_2$) on room air of:

    a. 60 mm Hg or less, at test sites less than 3000 feet above sea level, or

    b. 55 mm Hg or less, at test sites from 3000 to 6000 feet, or

    c. 50 mm Hg or less, at test sites above 6000 feet; or

2. Documentation of intrapulmonary arteriovenous shunting by contrast-enhanced echocardiography or macroaggregated albumin lung perfusion scan.

OR

F. Hepatic encephalopathy as described in 5.00D10, with 1 and either 2 or 3:

> 1. Documentation of abnormal behavior, cognitive dysfunction, changes in mental status, or altered state of consciousness (for example, confusion, delirium, stupor, or coma), present on at least two evaluations at least 60 days apart within a consecutive 6-month period; and
>
> 2. History of transjugular intrahepatic portosystemic shunt (TIPS) or any surgical portosystemic shunt: or
>
> 3. One of the following occurring on at least two evaluations at least 60 days apart within the same consecutive 6-month period as in F1:
>
>> a. Asterixis or other fluctuating physical neurological abnormalities; or
>>
>> b. Electroencephalogram (EEG) demonstrating triphasic slow wave activity; or
>>
>> c. Serum albumin of 3.0 g/dL or less; or
>>
>> d. International Normalized Ratio (INR) of 1.5 or greater.

OR

G. End stage liver disease with SSA CLD scores of 22 or greater calculated as described in 5.00D11. Consider under a disability from at least the date of the first score.

20 C.F.R. Pt. 404, App. 1 Subpt., § 5.05.  In order to meet Listing 12.09, a claimant must establish that his substance addiction disorder satisfies the requirements for one of following disorders:

A.    Organic mental disorder.  Evaluate under 12.02.

B.    Depressive syndrome.  Evaluate under 12.04.

C.    Anxiety disorders.  Evaluate under 12.06.

D.  Personality disorders. Evaluate under 12.08.

E.  Peripheral neuropathies. Evaluate under 11.14.

F.  Liver damage.  Evaluate under 5.05.

G.  Gastritis.  Evaluate under 5.00.

H.  Pancreatitis.  Evaluate under 5.08.

I.  Seizures.  Evaluate under 11.02 or 11.03.

20 C.F.R. Pt. 404, App. 1 Subpt., § 12.09.  The ALJ concluded that plaintiff did not demonstrate limitations such that he satisfied the requirements of either Listing 5.05 or 12.09.  The ALJ determined plaintiff's RFC, finding that plaintiff was unable to push or pull with his right leg, but that plaintiff was able to stand and walk about four hours in an eight-hour workday; sit six hours in an eight-hour workday; lift and carry twenty pounds occasionally and ten pounds frequently.  With respect to his nonexertional limitations, the ALJ found that plaintiff was unable to respond appropriately to supervision, co-workers, and usual work situations; remember and carry out even simple instructions; or make adjustments to routine work changes.  (Tr. 12).  The ALJ also concluded that plaintiff could not perform his past relevant work and that plaintiff was disabled.

The ALJ then determined that plaintiff was not disabled due to substance abuse.  "An individual is not considered to be disabled . . . if alcoholism or drug addiction would . . . be a contributing factor material to the Commissioner's determination that the individual is disabled."  Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002), quoting 42 U.S.C. §

423(d)(2)(C); see also Brueggemann v. Barnhart, 348 F.3d 689, 693 (8th Cir. 2003). "Under both 20 C.F.R. § 404.1535 (disability) and 20 C.F.R.§ 416.935 (supplemental security income), the relevant inquiry is 'whether [the Commissioner] would still find [the plaintiff] disabled if [he] stopped using drugs or alcohol.'" Estes, 275 F.3d 722. The plaintiff "carries the burden of proving [his] substance abuse is not a contributing factor material to the claimed disability." Id., citing Mittlestedt v. Apfel, 204 F.3d 847, 852 (8th Cir. 2000). "However, the ALJ retains the responsibility of developing a full and fair record in the non-adversarial administrative proceeding." Brueggemann, 348 F.3d 689, 693, citing Hildebrand v. Barnhart, 302 F.3d 836, 838 (8th Cir. 2002). Before the ALJ even considers a plaintiff's drug or alcohol use, the ALJ must first determine that the plaintiff is in fact disabled. Brueggemann, 348 F.3d at 693.

Plaintiff contends that the ALJ "engaged in a drug and alcoholism analysis at the incorrect step of the evaluation process[,] which [was] outside the standards under Brueggeman[n], and as a result failed to properly consider [the] residual functional capacity for [p]laintiff's physical ailments." (Doc. #18, at 23). The Eighth Circuit explicitly states that the ALJ must first determine whether the plaintiff is disabled "without segregating out any effects that might be due to substance use disorders. . . . If the gross total of a claimant's limitations, including the effects of substance use disorders suffices to show disability, then the ALJ must next consider which limitations would remain when the effects of the substance use disorders are absent."

Brueggemann, 348 F.3d at 694-95 (footnote and citations omitted)(emphasis added).  In the instant case, the ALJ first considered whether plaintiff was disabled, excluding his substance use.  (Tr. 11-45).  Therefore, the question remains whether the ALJ properly determined whether plaintiff was disabled in the absence of his substance use.

The ALJ found that, if plaintiff "stopped the substance use, . . . [his] medically determinable impairments could reasonably be expected to produce the alleged symptoms, but [plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms [were] not entirely credible."  (Tr. 17).  The ALJ rejected plaintiff's subjective complaints and testimony.

> To assess [a plaintiff]'s credibility, the ALJ [must] consider all of the evidence, including prior work records and observations by third parties and doctors regarding daily activities, the duration, frequency, and intensity of pain, precipitating and aggravating factors, dosage, effectiveness, and side effects of medications, and functional restrictions.  The ALJ may not discount a [plaintiff]'s complaints solely because they are not fully supported by the objective medical evidence, but the complaints may be discounted based on inconsistences in the record as a whole."

Lowe v. Apfel, 226 F.3d 969, 971-72 (8th Cir. 2000), citing Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984).

The ALJ properly discounted plaintiff's testimony and complaints.  At the hearing before the ALJ, Plaintiff testified that he (1) never worked while in prison; and (2) experienced difficulty with memory and comprehension as a result of the concussion that he suffered while in the Navy.  The record, however, indicates that plaintiff received clearance to work for food service

while he was in prison. The record also reveals that, despite his concussion, plaintiff subsequently earned a bachelor of science degree in psychology within four years. Plaintiff did not testify that he suffered any memory or comprehension difficulties while pursuing his college degree. Based on the foregoing, the record supports the ALJ's determination to discount plaintiff's subjective complaints.

The ALJ determined that plaintiff's pain level decreased with periods of alcohol abstention. The record indicates that, on a scale from zero to ten, plaintiff reported a pain level of two on October 25, 2002 and November 12, 2002, three on April 22, 2002, and five on July 24, 2002. Plaintiff testified that he did not become sober until October 2004. The record reveals that plaintiff experienced a pain level of six on March 23, 2005. Therefore, plaintiff's pain level in fact increased after he became sober. As such, the record does not support the ALJ's determination that plaintiff's pain level would have been eliminated by discontinuing substance use.

The ALJ determined that plaintiff's lack of treatment for his knee pain and depression were "inconsistent with significant limitations in [plaintiff's] functioning prior to [his] last date insured." (Tr. 18). "[B]efore a claimant is denied benefits because of a failure to follow a prescribed course of treatment[,] an inquiry must be conducted into the circumstances surrounding the failure and a determination must be made on the basis of evidence in the record whether [the treatment would] restore [a claimant]'s ability to work or sufficiently improve his condition." Burnside v. Apfel, 223 F.3d 840, 844 (8th

Cir. 2000) (emphasis added). The ALJ does not cite to any authority that indicates that a medical physician prescribed treatment for plaintiff's knee pain or depression, nor does he engage in an analysis of whether a prescribed treatment would have restored plaintiff's ability to work or sufficiently improve his condition. The disregard of this analysis constitutes error and does not support the ALJ's reliance on plaintiff's alleged failure to take pain medication for his knee pain and depression in determining plaintiff's RFC.

Based on the foregoing, the ALJ failed to develop a full and fair record to support his conclusion that plaintiff's limitations would remain in the absence of his substance use.

Plaintiff next argues that the ALJ failed to properly consider his past relevant work as a drug and alcohol counselor under the standard outlined in Pfitzner v. Apfel, 169 F.3d 566, 568-69 (8th Cir. 1999). The Eighth Circuit requires "'[t]he ALJ [to] make explicit findings regarding the actual physical and mental demands of [a plaintiff]'s past work.' The ALJ may discharge this duty by referring to the specific job descriptions in the Dictionary of Occupational Titles that are associated with the [plaintiff]'s past work." Pfitzner, 169 F.3d at 569 (emphasis added).

Before analyzing plaintiff's ability to perform his past relevant work, the ALJ acknowledged that he had to consider both the physical and mental demands of such work. The ALJ rejected plaintiff's claim that "his knee and shoulder problems precluded work, [because] he last worked as a painter and temporary laborer." (Tr. 19). Moreover, the ALJ stated that "[t]he evidence

show[ed] the [plaintiff] was able to work with his knee problem for many years at more demanding jobs, and he did not complain to Dr. Downing about his knee becoming more painful until March 16, 2004." (Tr. 19). The ALJ, however, does not mention the mental demands of plaintiff's ability to work as a drug and alcohol counselor. Moreover, although the ALJ stated that plaintiff's past relevant work was "in the sedentary exertional category[,]" the ALJ did not refer "to the specific job description in the <u>Dictionary of Occupational Titles</u> that [was] associated with [plaintiff]'s past work." As such, the ALJ's determination that plaintiff would be able to perform his past relevant work in the absence of his substance use is not supported by substantial evidence on the record as a whole.

## VI. Conclusion

For the reasons discussed above, the Court finds that the Commissioner's decision is not supported by substantial evidence in the record as a whole.

Accordingly,

**IT IS HEREBY ORDERED** that the relief sought by plaintiff in his brief in support of complaint [Doc. #18] is **granted.**

**IT IS FURTHER** ORDERED that the decision of the Commissioner is **reversed** and this case is **remanded** for further proceedings, pursuant to sentence four of 42 U.S.C. § 405(g).

_____
CAROL E. JACKSON
UNITED STATES DISTRICT JUDGE

Dated this 16th day of March, 2009.